J. Courtney McGroarty, J.
This action is brought by a ■group of gas service station operators in the Borough of Brook *41 lyn' against Amoco Oil Co. (hereinafter referred to as the Company) wherein they seek a mandatory injunction directing the defendant to fill all their orders for gasoline with reasonable promptness. By orders to show cause dated May 10,1973, plaintiffs were granted a stay until the return date of the motion, and defendant was ordered and restrained from refusing to fill all orders made by the plaintiffs of the defendant for gasoline with reasonable promptness. The stay continues in effect and the trial of the action has now been had.
The plaintiff Salvatore ft. Civello operates a station at 6302 Avenue N under the name of G. W. S. Service Stations, Inc.; the plaintiff Gideon Tung and one Seymour Leopold operate a station at 2570 East 17th Street under the name of Dial Motor Sales, Inc.; the plaintiff Reynaldo Grullion operates a station at 865 Rogers Avenue under the name of Grullion Bros. Auto Service, Inc.; the plaintiff Mahfus Allan operates a station at 4001 Fourth Avenue under the name of Allan Bros. Auto Service, Inc.; the plaintiffs Konstantinos Hatzizisis and George Varikos operate a station at 7310 New Utrecht Avenue; and the plaintiff Tona Benyaminy operates a station at 1775 Coney Island Avenue under the name of Double Four Way Car Wash Corp.
All of the plaintiffs except Konstantinos Hatzizisis and George Varikos and plaintiff Tona Benyaminy operate under written dealers agreement signed on behalf of the defendant, and plaintiffs Konstantinos Hatzizisis and Tona Benyaminy have been receiving deliveries under contracts signed by them but not signed on behalf of the defendant, reference to which will be made hereinafter. The contracts are all similar in form and in substance provide that the Company agrees to sell and deliver and the dealer agrees to purchase such quantities of specified type of Amoco gasoline as the dealer may order from titile to time during the one-year period of the agreement. Paragraph 4 thereof provides as follows: “ Company agrees to fill all orders with reasonable promptness but shall not be held responsible for losses resulting from delays in filling orders or failure to make delivery by reason of interruption of transportation, fires, strikes, picketing, or any cause beyond Company’s control. Company reserves the right to comply with any order or request of any governmental authority or agency. If such compliance results in any change in the quantity, price or point of delivery, or in the performance of any other obligations of Company under this contract, all future obligations of both parties shall cease unless such change is satisfactory to Dealer.”
*42 Among the affirmative defenses interposed in the Company’s answer is section 2-615 of the Uniform Commercial Code. That section provides in part :
“ Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance :
“ (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
“ (b) Where the causes mentioned in paragraph (a) affect only a part of the seller’s capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.”
Equity took jurisdiction of this case on a showing by plaintiffs that the failure of the Company to make daily deliveries as required under the terms of its contract constituted a continuing breach which ultimately would result in a multiplicity of suits, and the failure of the Company to meet their demands would result in irreparable injury to them and effect a loss of their business.
Equity has from early times decreed that mandatory injunctions are not readily granted and constitute one of the most severe forms of provisional remedies when granted on a preliminary or final basis. They can be fraught -with extreme danger and should therefore be granted with extreme caution inasmuch as the granting thereof may result in as much injustice as it would promote justice (Brown v. Newall [1837], 2 Myl. & Cr. 558, 570).
In Bonaparte v. Camden & A. R. Co. (Fed. Cas. No. 1,617 [1830]), Baldwin, J., wrote: “ There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages.” (V. 3, p. 827.) Every case therefore must depend upon its own circumstances and- the *43 court will not interfere by way of mandatory injunction except in cases in which extreme, or in all events very serious damage will ensue from withholding thereof (Durell v. Pritchard [1865], 1 Ch. App. 244; see, also, Lexington & Fortieth Corp. v. Callaghan, 281 N. Y. 526; Veal v. Scheiner, 18 Misc 2d 962).
■The justification for granting a mandatory injunction and the circumstances under which it will properly lie are well summarized in High on Injunctions (vol. 1, 7th ed., 5-6, 1905) as follows: “ While the jurisdiction of equity by way of mandatory injunction is rarely exercised, and while its existence has even been questioned, it is nevertheless too firmly established to admit to doubt * " * It is to be observed, however, that courts of equity rarely interfere to command the doing of a positive act, but the same result is obtained by framing the injunction in an indirect form and prohibiting the defendant from doing the reverse of what he is desired to do. Even then the jurisdiction is exercised with extreme caution * * * And in determining whether to grant relief by way of mandatory injunction courts of equity will take into consideration the relative convenience and inconvenience which would result to the parties from granting or withholding the relief
It is on that basis that the court considers the determination of the issues here presented, having in mind that equity will not hesitate to act when justice requires its intervention.
On May 23, 1973 the Department of the Treasury issued a voluntary program for the allocation of crude oil and refinery products (38 Fed. Reg., p. 13588). The regulation contains guidelines for allocation established by the Federal Government. The general policy direction is vested in the Oil Policy Committee and day-to-day administration of the program has been assigned to the Office of Oil and Gas, Department of the Interior. The regulation requires suppliers to make available to their customers the same percentage of their total supply of crude oil and products that they provided during the corresponding quarter of the base period. The base period is the fourth quarter of 1971 and the first three quarters of 1972, whichever is lower. The regulation further provides in subdivision b of section 1: “ This program is not intended to obligate a supplier beyond the extent of his base period supplies to a customer, nor is it intended to limit the supplies to the obligated amounts. A customer is defined as any person who purchased crude oil or petroleum products from the supplier during the base period.” (Emphasis supplied.)
*44 Subdivision b of .section 2 of the regulations provides for new customers and states: ‘ ‘ All suppliers are urged to continue to supply customers that they have added since the base-case period and to provide a listing of such customers and supplemental supply commitments to the Office of Oil and Gas for consideration in the assigning of supplies under section 3.”
Section 3 provides for Government assistance in allocation and application by a supplier and by nonpriority customers.
Section 4 provides for the filing of complaints with the Office of Oil and Gas.
Section 6 calls for pre-emption of the Federal Government in the administration of the program and provides in part: “ Tp the fullest extent legally permissible under the authority granted by the Economic Stabilization Act Amendments of 1973, it is the intent of this program to federally pre-empt the States from entering the field of allocation of crude oil and refinery products.”
Section 7 provides for exceptions as follows: 1 ‘ The intent of this program is to assure adequate supplies for essential needs and provide an equitable basis for assuring that independent members of all segments of the industry obtain sufficient supplies to meet their customer’s needs. If the results of some aspects of the program are contrary to this intent, the supplier affected may request that the Office of Oil and Gas grant an exception on the basis of unintended results.”
Subdivision (a) of section 211 of the Economic Stabilization Act of 1970 (P.L. 92-210; 85 U. S. Stat. 743, 748) provides: “ The district courts of the United States shall have exclusive, original jurisdiction of cases * * * arising under this title * * * except that nothing in this subsection * * * affects the power of any court of competent jurisdiction to consider, hear, and determine any issue by way of defense (other than a defense based on the constitutionality of this title or the validity of action taken by any agency under this title) ”.
The Company has urged by way of defense that pre-emption applies in this case. The court, however, is not in agreement with that contention and will determine the issues tendered herein within the exceptions noted in the act itself, and grant, such equitable relief as the proof and justice require. The first and second affirmative defenses are therefore stricken as matter of law.
Plaintiffs urge in response to the exclusion provision in the Company’s contract and the application of section 2-615 of the Uniform Commercial Code the buyer’s right to specific perform *45 anee set forth in section 2-716 of the Uniform Commercial Code, which provides in part as follows: “ (1) Specific performance may be decreed where the goods are unique or in other proper Circumstances.” (Italics supplied.)
This section also provides for an injunction against a breach. Comment 1 of the Purposes of Change (McKinney’s Cons. Laws of N. Y., Book 62½, Uniform Commercial Code, § 2-716, Official Comment) states: “ However, without intending to impair in any way the exercise of the court’s sound discretion in the matter, this Article seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale.”
The defendant did not allocate gallonage on the basis of the base periods set forth in the regulation but with respect to plaintiffs, Dial Motor Sales, Inc., Grullion Bros. Auto Service, Inc., Allan Bros. Auto Service, Inc., and Double Four Way Car Wash Corp., they took the average monthly sales for the calendar year 1972, as then in operation as a gas station, by their prior operators.
Defendant’s regional vice-president for the eastern region of the United States testified to meetings with respect to allocations in early 1973 and the indications then evident of a shortage beginning to develop. The Company then refused to bid on government contracts, city and power company contracts in January, 1973, a policy followed then by other companies. This policy was later reversed with the resultant need to allocate to its customers.
On April 1, 1973, the Company allocated to all jobbers in the United States on the basis of 103% of prior gas purchases. . The jobber then distributes the Company’s products to its own stations, but no distribution is made to plaintiffs herein through jobbers. In April, 1973, dealers were showing gains in sales beyond expectation. In May, 1973, the Company adopted an allocation program as to all on the basis of 100% of the average through the year 1972. New stations were allocated on estimated volume, and on or about June 8, 1973 the Company issued a press release to the effect that it would give full compliance to the Federal program of allocations on a nondiscriminatory basis.
W^th respect to the plaintiffs, G.W.S. Service Station, Inc. and Konstantinos Hatzizisis, the Company made an allocation on a 100% estimate of capacity of the stations in those respective locations.
*46 It was stipulated during the course of tie trial that there is an oil shortage and no proof was required thereon.
As the cgurt has noted herein by emphasis, the regulation (§ 1, par. b) refers to a customer •“ as any person who purchased crude oil- or petroleum products from the supplier during the base period. ” It may be noted in passing that none of the plaintiffs operated the stations during the base' periods as defined in the regulation, but the defendant ta^es the position that it is the station’s capacity rather than the individual operating the station which is controlling. This does not seem to come within the language of the regulation which refers to a “ person.”
“New customers” as defined in the regulation, which the suppliers are urged to continue to supply, are those whom they have added since the base case period. All of the plaintiffs come within that category.
Plaintiff, Salvatore B,. Civello, began operating the station at 6302 Avenue N, under contract with the Company dated March 5, 1973, the second week in March, 1973, and has been allocated 20.000 gallons for the month of June, 1973. His gallonage sales for three weeks in March were 37,000 gallons, for April 46,600, and for May 59,416 gallons.
• Before the Company supplied the station it was a Mobil Oil station, and when acquired by Stanley Coven, as leaseholder, and changed to Amoco, he estimated the station as good for 50.000 gallons a month. He has been a gas station operator for 20 years and has been a leaseholder of all the stations operated by the defendants except 1775 Coney Island Avenue, operated by defendant, Yona Benyaminy, as Double Four Way Car Wash Cprp.
Leonard Schwartz, an accountant with 10- years’ experience in the operation of gas supply stations and familiar with the systems employed therein, has projected on the basis of the two months ’ operation of the stations,, that the reduction to 20,000 gallons amounted to 42.8%, and on a cash-flow basis he estimates a loss of $726 a month on an allocation of 20,000 gallons. However, on cross-examination his estimate was seriously impaired, although he testified that the April profit on 46,000 gallons was $116 before payment of notes payable — one of .$100 a month to Civello to buy him out at a 100% profit on his investment. The statement of operations carries through a projection of operating costs and expenses on the basis of 100%, 90.9%, 80% and 42.8%.
While it is true that the projected loss of $726 a mdnth on the volume of 42.8% of capacity is subject to adjustment on rise *47 in prices and adjustment of operating expenses, the court is of the opinion that a reasonable allocation for this station at 6302 Avenue N is 34,000 gallons a month.
The. station at 2570 East 17th Street, operated by plaintiff, Gideon Yung and one Seymour Leopold, under the name of Dial Motor Sales, Ielc., became operative by said plaintiffs at the end of March, 1973 and was taken over by Stanley Coven as leaseholder on July 1, 1972. It had formerly been a parking lot and the operator thereof had been dispossessed by Coven when the prior operator was sentenced to prison. Coven operated the station from October 23,1972 to March, 1973.
Seymour Leopold, an officer and stockholder of Dial Motor Sales, Inc., testified that it took over the station at. the end of March, 1973, paid $10,000 for the good will, and executed notes payable in the amount of $500 a month for the balance due to Coven, from whom they purchased it. Seymour Leopold had sold a.cab medallion for $26,000 and after paying off the payments due thereon, he received the amount of $6,000 net. He has two partners and two steady employees; one of said partners still drives a cab. The partners draw $125 a week and the two helpers draw $125 a week. His sales, other than gas, amount to $3,450 a month including $450 in parking fees, and the business does not show any profit at the present time. The station has been allotted 38,000 gallons for the month of June. For the balance of the month of March, 1973, they sold 36,000 gallons and in April, 87,000 gallons. The average monthly sales for 1972, on the basis of which their allotment was made, were attributed by Stanley Coven, their immediate lessor, to bad operation, which necessitated his take-over. The accountant’s statement shows a monthly profit on 100% gasoline sales of $379, but on a projection of 43.7 % of maximum a loss of $1,088. One block away from this station is a Mobil gas station which is the largest station in New York City. Making the allocations for this station, the company did not consider 1973 sales, whieh were not generally considered in the district under the jurisdiction of the district manager of the New York district.
Considering all the factors in this case, the court is of the opinion that a reasonable monthly allocation for this station is 49,000 gallons.
The plaintiff, Reynaldo Grullion, operating Grullion Bros. Auto Service, Inc. at 865 Rogers Avenue, has been allotted 18,000 gallons for the month of June on an average of monthly sales during the calendar year 1972. This station was operated by Stanley Cóven as the leaseholder from 1968 or 1969 with an *48 average in 1968 of 28,000 to 32,000 gallons a month. Prior to the present operation, he had to take back the station and operated it from the beginning of February, 1973. In his opinion, to break even, allocation would be 50,000 gallons a month. Reynaldo Grulion, a partner in Grulion Bros. Auto Service, Inc., operates the station with two brothers and one mechanic. He paid $10,000 to purchase this station with money he borrowed from the Chase Manhattan Bank to which he pays $150 a month. Each one of the partners and the mechanic draw $150 a week. He testified that he cannot operate on 18,000 gallons a month. His contract with the Company is dated February 20, 1973; in the month of February he sold 41,000 gallons, in March 47,000 gallons, and April 42,000 gallons. In April he sold gas at 38.9$ a gallon, with a gross profit of 2.6$ per gallon, and at 39.9$ a gallon with a gross profit of 3.5$ per gallon. He then raised his price to 42.9$ a gallon, with a gross profit of 3.8$ per gallon, and to 43.9$ a gallon, with a gross profit of 4.7$ a gallon!
The statement by accountant Schwartz on a 100% basis shows a profit of $152 a month, and on 42-9% of maximum, a loss of $645. Here again, cross-examination disclosed that with the increase in the price of gas sales without a corresponding increase in price to the supplier, the figures submitted are subject to substantial readjustment.
The allocation of 18,000 gallons for June is based on an average of 1972 sales of 15,000 gallons. In the opinion of the court, on the basis of the proofs .submitted, the reasonable allocation for this station is 30,000 gallons.
The plaintiff, Mahfus Allan, operates Allan Bros. Auto Service, Inc. at 4001-4th Avenue under contract with the company dated February 19, 1973. Here again, Stanley Coven was the original lessee and took the station over in 1969/1970 because of absenteeism of his then sublessee. He expressed his professional opinion that under present management the station could do 100,000 gallons a month. The plaintiff is allocated 65,000 gallons for the month of June, 1973.
In February, 1973, the station did 77,000 gallons, in March 85,700, in April 71,500, and in May 71,850. The present operator took over on May 19,1973. In the opinion of the court, the allocation made to this station by the defendant is reasonable within the intent and meaning of the regulation.
The .station at 7310 New Utrecht Avenue, operated, by plaintiffs, Konstantinos Hatzizisis and George Varikos, has been allotted 50,000 gallons for the month of June, 1973. Their contract with the defendant is dated May 8,1973, signed by them but *49 not signed by the defendant, although deliveries were made by defendant to them after the signing of the contract. These plaintiffs claim that a prior contract had been signed earlier than the May 7 contract, but had been lost or misplaced by the Company. The Company denies this.
The testimony establishes that plaintiff Hatzizisis was informed on May 7,1973 that a rationing program was in process and he was asked by Mr. Miller, the Company’s field sales manager, if he was aware of the allocation of 50,000 gallons. The agreement was then signed. Mr. Lessa, territorial manager for the Company, testified that on May 4, 1973 he had a conversation with Mr. George Coven with respect to a dealer change for this station and Coven told him he had a man for the account and he would be available to sign in. On May 7 the dealer change was accomplished with Mr. Miller, Mr. Lessa and plaintiffs Hatzizisis and Varikos present. Miller then told Hatzizisis that . the present station allocation would be 50,000 gallons. Plaintiff Hatzizisis made no comment with respect thereto. An agreement was then also made on the security deposit.
The prior operator of this station sold 107,000 gallons in January, 1973, reduced to 98,700 gallons in February because of additional tank construction by the company, increased in March, 1973 to 112,500 gallons, in April reduced to 104,300 gallons because they were closed on Sundays. Mr. George Coven, prior operator of this station, testified that he operated it after taking it back in August, 1972, and there was no history with respect to any operation by plaintiff Hatzizisis. He testified that he did not know of the allocation when he sold to Hatzizisis, but knew of it after May 3, 1973, but did not know the ratio. He claims that the Company advised Hatzizisis of the allocation after the agreement was signed and he was told that all stations would be allocated. He still retains an interest, in that he gets a percentage on all gas sold. The court finds that the purchase was made in the light of the imminence of gas’ rationing.
Plaintiff, George Varikos, testified that he and his partner paid $8,000 for the goodwill of the station and $2,000 security in full. They have no savings. He and his partner draw $150 a week, with one worker paid $100 a-week.
Leonard Schwartz, the accountant, testified as to his audit with respect to the station; that he had erred in his calculation of -one third high test gasoline and two thirds regular gasoline, whereas the operation was two thirds high test and one third regular. On the basis of 100% allocation, he computes a loss of. $473; on the basis of 50,000 gallons, which is 49.5% of maxi *50 mum, a loss of $925. On cross-examination he testified that the 50.000 gallon allocation was based on a pure estimate and the figures could be. adjusted to show a small profit on shorter hours and employment of less help.
On the basis of all the testimony before the court, it concludes that the reasonable allocation for this station is 75,000 gallons <
Plaintiff Tona Benyaminy, operating Double Four Way Car Wash Corp. at 1775 Coney Island Avenue, presents an unusual operation. He paid $205,000 fori the station, $20,000 cash and notes for the balance to the previous operator, 1775 Coney Island Avenue Corporation at $1,251 a month. He assumed notes for the car wash operation amounting to $1,203 a month. Rent ánd taxes are $1,800 a month and payroll $5,500 a month consisting of two partners and four employees. They operate 2? pumps and service 10 cars-at one time, and are open seven days a week from 6:00 a.m. to 10:00 p.m. The station only sells gas aiid oil and car wash:
The testimony establishes that, omitting rainy days on which no car washes are accounted for, the number of car washes bears a direct proportion to the number of gallons sold, the price for a car wash being reduced by the purchase of gasoline. His accountant, Edward Vernikoff, testified that there was an operáting profit on the basis of 100% of allocation, and the station operates just a car wash and sales of gas and oil with no repair facilities.
Plaintiff Benyaminy .testified that he had raised the price of gasoline although the price to him had not been raised by the Company.
The contract signed by him and not signed by the Company is dated May 18, 1973, although the Company had been delivering gasoline under the unilateral contract which he had signed. He became the owner of the -station in March, 1973 and sold 182.000 gallons in March, 175,000 in April, and 154,000 in May. He testified that it is impossible, because -of the manner of his operation, to cut down on personnel as he requires two men to pump gas, one to take the cars into the wash, one to wipe the windows, and with his partner, he is the general manager of the. operation. On a Sunday, May 6,1973, a sunny day on which he did not sell any gas, he washed 45 cars, whereas on May 7, 1973, when he sold 4,300 gallons -of gas, he washed 562 cars until he went out of gas and gave a reduction of 50^ per car wash.' He testified he continued to raise his price on blue and premium gas even though the Company did not increase its price to him. His weekly payroll amounts to $745, and in the first *51 week in May he started rationing the sale of gas and refused to sell on Sundays.
On the basis of the testimony before the court and in consideration of the nature of this operation, the court finds a fair and reasonable allocation would be 104,000 gallons a month.
, In making these allocations, the court is constrained to find a fair and reasonable allocation of gas within the meaning of the Federal regulation, having in mind the nature of the business of each plaintiff and their prior experience in the field, treating them not on the basis of the operation of a station during the base period but on the basis of their operation as a “ person within the regulation. Plaintiffs on the trial offered to accept a reasonable adjustment in the allocation of gasoline to them.
The situation as it appears to the court is one Which requires relief by mandatory injunction, but plaintiffs may not demand more than is reasonable. They must accommodate themselves in the operation of their business to the shortage of available gasoline, and adjust their operations accordingly by reduction of personnel, limitation of gas sales to their customers and shorter hours. The situation may well be stabilized within a short time when the Office of Oil and Gas of the Department of the Interior has set up its operation and program for the granting of exceptions under section 7 of the regulation.
Accordingly, the court will continue and grant a mandatory injunction directing the defendant to fill all orders of the plaintiffs within the amounts herein found by the court to be reasonable, said injunction to expire automatically on August 31, 1973 as to all of the plaintiffs or sooner as to any one of them on the granting of an exception under the regulation by the Office of Oil and Gas.